## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Case No. _____

**ANTHONY WALLER**,

     Plaintiff,

v.

**CITY and COUNTY of DENVER**, a municipal corporation**,**
**BRADY LOVINGIER**, individually and in his official capacity,
**GINA MCCALL**, individually and in her official capacity.

     Defendants.

---

## COMPLAINT FOR DAMAGES

---

**COMES NOW** the above-named Plaintiff, Anthony Waller, by and through his attorneys, Kenneth A. Padilla of Padilla & Padilla, PLLC and complains and alleges as follows:

### I.  NATURE OF CLAIM

1.     This is an action for damages against Defendants City and County of Denver (Denver), Deputy Brady Lovingier and Captain Gina McCall and for injunctive relief against the City and County of Denver for the deliberate indifference to the Plaintiff Waller's well established constitutional rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and for maliciously prosecuting the Plaintiff, Anthony Walller.

### II.  INTRODUCTION

2.     On September 11, 2012 Anthony Waller suffered serious and permanent injuries when he was assaulted and battered while being advised of his rights in court by a judge in

Courtroom 2300 in the Van Cise - Simonet Detention Center (Denver City Jail).  Mr. Waller was in the custody of the Denver Sheriff's Department under pretrial detention, when he was attacked, beaten, assaulted and battered by Defendant Lovingier who used excessive and unreasonable force  against Mr. Waller.  Thereafter the Defendant Lovingier and Defendant Captain Gina McCall had Mr. Waller falsely arrested and maliciously prosecuted in an effort to cover up the brutal, unprovoked attack upon Mr. Waller during his court appearance.

3.      Plaintiff alleges that Defendants violated his well established Fourth, Fifth, Sixth, Eighth and Fourteenth Amendment rights when Defendants intentionally, knowingly, recklessly and with deliberate indifference to his constitutional rights subjected him to a brutal, unjustified and illegal use of excessive force and cruel and unusual punishment and malicious prosecution.

4.      Plaintiff further alleges Fourth, Fifth, Sixth, Eighth and Fourteenth Amendment violations against Defendant Denver's official government custom, policy or practice with deliberate indifference to the Plaintiff's constitutional rights resulting in an intrusive, unjustified and illegal use of excessive force and cruel and unusual punishment against him.

5.      Defendants' conduct was performed under color of state law and directly or proximately caused the deprivation of Plaintiff Waller's well established federally protected rights.  Denver has a continuing, persistent and widespread practice of unconstitutional misconduct by its law enforcement (both Denver Police and Denver Sheriff's Department) of engaging in excessive force against persons with which Denver law enforcement must contact. Denver is deliberately  indifferent to the use of excessive force and by its deliberate indifference approves, condones, and ratifies its law enforcements' use of force, which is performed through official custom, policy, or practice.

2

6.     This incident is one of many resulting from Denver's custom policy and practice of engaging in excessive force and failing to monitor, safeguard and protect the health and safety of detainees in the custody of the Denver Sheriff's Department.

## JURISDICTION AND VENUE

7.     Jurisdiction over Plaintiff's claims is conferred upon this Court pursuant to 28 U.S.C. §§ 1331 and 1343 and this case is brought pursuant to 42 U.S.C. §§ 1983, 1985 and 1988.

8.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b).  All of the events alleged herein occurred in the State of Colorado, and all of the parties were residents of the State of Colorado at all times pertinent to the events alleged herein.

## PARTIES

9.     At all times pertinent to this complaint the Plaintiff, Anthony Waller was a citizen of the United States of America and a resident of the State of Colorado.

10.     That the Defendant, the City and County of Denver, is a municipal corporation within the State of Colorado and existing by virtue of the laws, constitutions and statutes thereof, and at all times relevant to the allegations of this complaint was the employer of Defendant Lovingier.

11.     At all times pertinent to this complaint the Defendant Brady Lovingier was a resident of the State of Colorado and was acting under color of state law in his capacity as a deputy sheriff employed by the City and County of Denver and upon information and belief was a citizen of the United States of America.

12.     At all times pertinent to this complaint the Defendant Gina McCall was a resident of the State of Colorado and was acting under color of state law in her capacity as a

3

Denver Sheriff Department (DSD) Captain employed by the City and County of Denver and

upon information and belief was a  citizen of the United States of America.

## **FACTUAL ALLEGATIONS**

13.     On September 11, 2012 the Defendant Brady Lovingier escorted the Plaintiff Mr.

Waller to his first advisement hearing in Denver County Court before Judge Doris Burd.

14.     As a deputy in the Denver Sheriff's Department Defendant Lovingier's primary

duties are the care, custody, control and protection of inmates.

15.     Defendant Lovingier had Mr. Waller  restrained wearing handcuffs, leg irons and

a belly chain all of which were joined in a box at Mr. Waller's waist.

16.     The Court advised Waller of his rights and why he was being held.  Mr. Waller

was very respectful and calm throughout the advisement and proceeded as follows:

> Judge: Good morning Mr. Waller.
> Waller: Good morning Ma'am.
> Judge: I'd like to give you an advisement.
> Waller: First advisement?
> Judge: Yes.
> Waller: Yes ma'am
> Judge: You could probably say it for me but I have to say it too.
> Waller: Yes, ma'am.  You want to get me on the record, eh?
> Judge: You bet.  If that's OK.
> Waller: All right, yes ma'am.

When Judge Burd finished giving Mr. Waller his Rule 5 advisement under the Colorado

Rules of Criminal Procedure, Mr. Waller began to politely address the Court in a normal and

subdued voice as follows:

> Waller: I'd like to object to her (the alleged victim) story.  If I'm
> under investigation, I thought the investigation came first, then the
> arrest came . . .
> Judge: Right, well they have three day . . .

4

17.     At this point without warning, justification or provocation, Defendant Lovingier, who was directly behind Mr. Waller, grabbed Plaintiff's belly chain and shirt, spun Mr. Waller around and threw him face first into the metal frame entrance into the glassed-in court prisoner detention area.  As a result of the Plaintiff Waller being chained and shackled he could not use his hands or feet to lessen the impact of his face and head being rammed directly into the glass wall and metal post by the Defendant Lovingier.  Mr. Waller collapsed to the floor, seriously injured.

18.     At no time was Mr. Waller's conduct threatening, aggressive, or unlawful.

19.     Plaintiff posed no danger to anyone when he was politely addressing the Court.

20.     At no time did Mr. Waller resist the Defendant Lovingier.

21.     Defendant Lovingier's assault on the Plaintiff Mr. Waller was captured on video. A series of snapshots of the video shows the Defendant Lovingier grabbing Mr. Waller as the judge is talking to him and ramming the Plaintiff Waller into the metal frame of the glass wall.









The video can be seen by following the link:

http://www.coloradoindependent.com/145994/unprovoked-courtroom-video-lovingier-sheriffs-deputy-attacking-waller.

22.     After Defendant Lovingier rammed Mr. Waller into the glass wall and metal frame, and the Plaintiff Waller was lying on the courtroom floor moaning, Lovingier stated:

> Lovingier: Get up, get up, get up.  Get on your feet.  You
> don't turn on me boy.

23.     The Plaintiff Anthony Waller is African American/Black.

24.     The Defendant Lovingier is white.

25.     The Defendant Lovingier calling the Plaintiff Waller a "boy" is a racially derisive comment.

26.     Defendant Lovingier then dragged Mr. Waller by the chain around his body, out of the Courtroom and into the prisoner holding area.

27.     Mr. Waller was subsequently taken by ambulance to Denver Health Medical Center to be treated for his injuries.  Plaintiff's injuries included severe bodily injuries to his head, including a deep head laceration, closed head injury and left orbital blowout fracture and injuries to his back, neck, legs, arms, ankles, including a hernia and his teeth were knocked out.

28.     After the assault Defendant Lovingier contacted the Denver Police Department (DPD) to file criminal charges against Mr. Waller for resistance.  When DPD arrived they declined to press charges against Mr. Waller, after investigating and apparently viewing the video and easily determining that the Plaintiff did not resist, assault or otherwise commit any crime against the Defendant Lovingier.  Denver Sheriff's Department Captain Gina McCall

subsequently called the DPD supervisor and demanded that a Denver police officer return to take the report and file criminal charges against the Plaintiff Mr. Waller.

29.     The Denver Police Department complied returning to the jail and the Defendant Lovingier signed a Complaint against Anthony Waller for Resisting Police Authority in violation of DRMC Section 38-32(b).

30.     On October 8, 2012 Assistant City Attorney Emily Reisdorph filed a Motion to Dismiss on the grounds that the City could not prove its case beyond a reasonable doubt.

31.     Judge Doris Burd reported the incident to the Presiding Judge of the Denver County Court, John Marcucci who filed a Complaint against Defendant Lovingier.

32.     The Denver Sheriff Department Internal Affairs Bureau investigation took over one year to complete despite the fact the incident was videotaped and audio recorded and witnessed by Judge Burd and her clerk and other witnesses in the courtroom including several other Denver Sheriff Deputies.

33.     Over one year later on September 24, 2013 Deputy Manager of Safety Jess Vigil suspended Defendant Lovingier for 30 days for violating the following: DSD RR-300.22-Inappropriate Force; DSD RR-300.19.1-Disobedience of Rule: Departmental Order 5011.1J-Use of Force; Career Service Rule 16-60 for Neglect of Duty, Carelessness in Performance of Duties and Responsibilities, and Conduct Prejudicial to the Good Order and Effectiveness of the Department or Conduct That Brings Disrepute on or Compromises the Integrity of the City.

34.     Deputy Manager Vigil concluded that Defendant Lovingier's,

> "conduct was unprovoked . . . You (Lovingier) violated your duty, were careless in the performance of your duties and engaged in conduct prejudicial to the good order and effectiveness of the DSD.

> Your actions brought disrepute on and compromised the integrity of
> the Department and the City. This Department considers your actions
> to be egregious and unprofessional. Your conduct has breached
> several of the DSD's Guiding principles, including Respect, Fairness,
> Judgment, Sensitivity, Personal Leadership, Integrity, Accountability
> and Professionalism. Your action were also conduct prejudicial to the
> efficiency, good name and reputation of the City and County of
> Denver; and as such would cause the public and the courts to lose
> confidence in the DSD and or the Department of Safety."

35.    Deputy Manager of Safety Vigil found that Defendant Lovingier's claims, speculations, conclusions, interpretations and conduct was unreasonable, since Mr. Waller posed no threat to Defendant Lovingier at any time during this incident.

36.    Defendant Lovingier's 30 day suspension was affirmed on April 7, 2014 by Hearing Officer Bruce Plotkin in Career Service Board Appeal No. 48-13. Defendant Lovingier has appealed that decision to the Career Service Board and that appeal is pending.

37.    The unprovoked assault upon Anthony Waller is another example of the overwhelmingly common and routine use of excessive force by Denver Sheriff's Officers that has not been timely investigated, nor has there been appropriate discipline for the egregious use of excessive force by any officer of the DSD.

38.    In its 2013 Semiannual Report the Office of the Independent Monitor (OIM) reported its findings after conducting a review of DSD's inmate grievance system.

39.    The OIM found that inmate grievances that allege serious deputy misconduct are often not referred to or investigated by DSD internal affairs, as required by DSD police.

40.    The OIM found that the DSD is not routinely notifying the OIM of misconduct complaints contained in inmate grievances, as required by the OIM ordinance.

9

41.     The OIM found that the DSD has yet to develop a process for routinely and systematically analyzing patterns in inmate grievances to identify opportunities for operational improvement.

42.     The OIM found that DSD policies and practices may limit inmate access to the grievance process.

43.     The OIM found that from January 1, 2011 to June 30, 2013, only 6% of inmate allegations of serious misconduct were investigated by IAB.

44.     The OIM found that the DSD's failure to investigate allegations of serious misconduct "deviates from both DSD policy and national standards on law enforcement accountability."

45.     The OIM found that DSD routinely failed to notify the OIM of allegations of officer misconduct as required by Denver City Ordinance.

46.     The OIM was concerned about the length of time that IAB investigations took. The Waller Complaint took over one year to investigate.

47.     The OIM found that Denver's policy of failing to investigate serious allegations of inappropriate force "deviates from both DSD policy and national standards on law enforcement accountability."

48.     The City of Denver has created, fostered, condoned and tolerated an environment and culture of law enforcement (both Denver Sheriff and Police) brutality and deliberate indifference to the constitutional rights of citizens and residents.

49.     The Denver Department of Safety consists of both the Denver Police Department and the Denver Sheriff's Office. Law enforcement officials from both branches of the

Department of Safety have repeatedly and unlawfully used excessive force against citizens.

50.     Denver law enforcement officers have engaged in a persistent practice of use of excessive force, including failing to report, lying and cover ups and the officials responsible for assuring that such misconduct does not occur have consistently failed to properly train, supervise, and discipline individual officers who have engaged in such misconduct and have failed to stop the use of excessive force by Denver law enforcement.

51.     This culture and environment of brutality and the lack of training, supervision, and discipline of law enforcement officers is evidenced by, among other things, the sheer volume of lawsuits filed against and/or legal settlements with Denver law enforcement alleging excessive force, the involvement of dozens of different law enforcement officials in those lawsuits, and the repeated involvement of the same officers in multiple lawsuits.

52.     For example, Denver City Attorney David Fine reported to the Denver City Council in September of 2010 that the city of Denver has spent nearly $6.2 million since 2004 to settle lawsuits involving police officers, and nearly all of the payouts were for allegations of excessive force. Council members had asked Fine to research litigation patterns after controversy erupted the previous month over a video that showed an officer beating a 23-year-old man, Michael DeHerrera,  who was talking on a cell phone.  These statistics do not even include lawsuits against the City and County of Denver arising out of Sheriff's Department conduct.

53.     Most recently in July, 2014 the City of Denver announced that it has reached settlement in the amount of $3.25 million in the case of *Hunter v. City and County of Denver*, U.S. District Court Case No. 12-cv-02682-JLK-MJW involving injuries sustained by the Plaintiff Jamal Hunter for the DSD's failure to protect him and use of excessive force against him.

54.     Also, in July, 2014 three more videos surfaced showing the use of excessive force by the Denver Sheriff's Department.  One occurring on September 26, 2013 involved Sgt. Ned St. Germaine ordering two deputies to use a stun gun on an inmate, Isaiah Moreno, calmly sitting on his bunk on suicide watch.  Sgt. St. Germaine was given a ten day suspension.[1]  In the second incident on December 26, 2012 Deputy Steven Valerio is shown punching a handcuffed inmate, Robbi Martinez, in the face knocking him to the ground and then lifting the inmate by his handcuffed wrists.[2]  The third incident, on July 13, 2014, a few days prior to filing this lawsuit, Deputy Thomas Ford who, without any provocation or justification, is shown on video walking up and viciously striking inmate Kyle Benton Askin with his closed fist in the face.  When Mr. Askin falls to the ground he appears unconscious and Deputy Sheriff Ford is shown kicking Ms. Askin as he is lying defenseless on the ground.[3]

55.     In 2008, the City of Denver and Denver Health paid a combined $7 million to the family of Emily Rae Rice, who had died while in custody of the Denver Sheriff's Department Ms. Rice had alleged that the City's treatment of her after she was detained violated her constitutional rights leading directly to her death. It was alleged that the City had destroyed or otherwise tampered with video and other evidence, and had engaged in a cover-up of the

---

[1] Follow the link to the video:
http://www.denverpost.com/ci_26217681/two-denver-sheriff-deputies-dispute-discipline-latest-abuse

[2] Follow the link to the video:
http://www.denverpost.com/ci_26217681/two-denver-sheriff-deputies-dispute-discipline-latest-abuse

[3] Follow the link to the video:
http://www.coloradoindependent.com/148272/exclusive-video-denver-sheriff-deputy-belted-then-kicked-inmate-who-posed-no-apparent-threat

wrongdoing. After initially denying any liability on any of the claims, the Defendants paid $7 million and agreed to many policy changes. Defendant Faun Gomez in the Emily Rice case is also a Defendant in the *Estate of Marvin Booker v. City and County of Denver*, U.S. District Court Case No.  Upon information and belief, Defendant Gomez received no disciplinary action for her role in either the death of Emily Rice or the death of Marvin Booker.

56.     On March 15, 2011 the Estate of Marvin Booker brought an action for the killing of Marvin Booker, a homeless street preacher who was killed while he was incarcerated at the Denver Detention Facility.  *The Estate of Marvin Booker v. the City and County of Denver*, et. al. U.S. District Court Case No. 11-cv-00645-RBJ-KMT is set for trial to commence on September 22, 2014.

57.     Also in 2008, Denver paid $150,000 to Timothy Thomason, who was deprived of medical care while in the Denver City Jail.  Mr. Thomason was arrested on charges of cultivating marijuana. While being transported to jail, he informed the officers that he was suffering from terminal Stage IV non-Hodgkin lymphoma, and that he was taking massive amounts of pain killers and anxiety medications. The officers assured him that they would bring his medications to the jail. Once he arrived at the Pre-Arraignment Detention Facility, however, his repeated pleas for medication were ignored. A judge ordered his release, but he was forced to spend several more hours in jail, without his medication, until he suffered a seizure, banging his head on the cement floor of his cell. Mr. Thomason alleged that his treatment by the Denver Sheriff's Department violated his constitutional rights.

58.     On July 1, 2010, Robert Duran filed a lawsuit against the City and County of Denver and Denver Sheriff's Deputy Steven Koehler. Mr. Duran alleged that, while he was

waiting unescorted next to an elevator in the Denver County Jail as directed, Deputy Koehler approached him. Without warning or provocation, Deputy Koehler slammed Mr. Duran into the elevator wall. Deputy Koehler then dragged Mr. Duran approximately ten feet down the hallway. While Mr. Duran was handcuffed, Deputy Koehler kicked him all over his body and face. Mr. Duran was taken to the hospital by ambulance. Mr. Duran's injuries included scalp lacerations, bruised ribs, chest contusions, and closed head injury.  A Denver jury awarded Duran $40,000.00 after trial in 2013.

59.     Between January and June of 2010, seventeen Denver police officers were associated with excessive force complaints, a higher ratio per law enforcement officer than any other U.S. City.

60.     From 2004 to 2011, the average settlement in Denver for an excessive-force claim against the police was about $97,000. The city paid nearly $3 million to settle three lawsuits, pushing the average up.  With the large increase in suits and claims Denver will pay over $25 million in settlements for excessive force since 2004.

61.     On September 24, 2013 the City of Denver settled an excessive force claim  in the amount of $360,000.00 by four women, Kelly Boren, Sharelle Thomas, Ana Ortega and Kristal Carrillo that occurred in 2009 at the Denver Diner when Denver Police Officers Ricky Nixon and Kevin Devine menaced the women and shoved them to the ground and sprayed them with mace.

62.     In 2004, Denver paid the family of Paul Child $1.32 million to settle a lawsuit brought after Mr. Childs, a developmentally disabled 15 year-old boy, was fatally shot by Denver Police Officer James Turney.  Officer Turney responded to a 911 call from Mr. Childs' sister, and when he arrived at the house, Mr. Childs was holding a knife. When Mr. Childs refused to

drop the knife, Officer Turney shot and killed him. Two other officers were in the house with non-lethal tasers, which were not used. Mr. Childs' mother informed officers that he was a "special needs" child, but they nonetheless shot him from the front door while he was standing in the hallway.

63.     In 2004, Denver paid Terrill Johnson $75,000 to settle a lawsuit against the City, Denver Police Chief Gerald Whitman, and Denver Police Officers Troy Ortega, Louis A. Estrada, Perry Speelman, Richard Eberharter, Randy Yoder, and Danny Perez. Mr. Johnson alleged that as he was driving home from his job at Denver International Airport, he noticed he was being followed closely by a Denver Police patrol car. The officers in the car followed him to his residence. He went into his home, and when he went back outside to take out the garbage, the officers, still in their patrol car, were shining a spotlight into his car, which he had parked in front of the house. As the officers reversed the patrol car, they slammed into Mr. Johnson's wife's car. Mr. Johnson approached his wife's car to inspect the damage, and the officers exited the patrol car with their weapons drawn. They instructed Mr. Johnson, who was not armed, to throw down his weapon. Additional officers arrived at the scene, continuing to instruct Mr. Johnson to drop his weapon. He removed his shirt and raised his hands into the air to show the officers that he was not armed. The officers then rushed toward Mr. Johnson, slammed him onto a patrol car, punched him, forcibly subdued him while handcuffing him, and threw him into the patrol car, using racial slurs the entire time. Mr. Johnson was charged with two minor traffic offenses and interference; all charges against him were dropped.

64.     On February 25, 2004, Regina Keith filed a lawsuit on behalf of the estate of Gregory Lee Smith, Jr. against the City and County of Denver, Denver Police Chief Gerald

Whitman, Denver Police Officers Robert Silvas and Jim Turney, and unknown John Doe

Officers. Ms. Keith, Mr. Smith's mother, alleged that the officers arrived at her home after she

called 911 for assistance with a domestic dispute. When they arrived, Mr. Smith was in his

bedroom. Mr. Smith then exited his bedroom with a three-inch utility knife. The officers ordered

him to drop the knife, and when he didn't, they fatally shot him. Upon information and belief, the

individual officers settled the case for an unknown amount.

65.    On December 6, 2004, Richard Rra-Shada filed a lawsuit against the City and

County of Denver, Denver Police Officers Dennis Bedenbender and Shanna Michael, and Robert

A. Kaser. Mr. Rra-Shada alleged that Officer Bedenbender struck him with his police vehicle.

When Mr. Rra-Shada responded with a profanity, Officer Bedenbender got out of his police

vehicle, approached Mr. Rra-Shada, and clipped his legs from underneath him, causing him to

fall head-first onto the pavement. Officer Michael then hit Mr. Rra-Shada with her nightstick and

kicked him repeatedly in his torso. At the same time, Officer Bedenbender was punching Mr.

Rra-Shada in the head with closed fists. Mr. Rra-Shada's injuries included head and brain

trauma, as well as injuries to his shoulder, wrist, back, ribcage, and abdomen. He also began

suffering seizures after the incident. Upon information and belief, the case was settled for an

unknown amount.

66.    On July 1, 2005, Jeffrey R. Mayton filed a lawsuit against the City and County of

Denver and Denver Police Officers Josh E. Valerio, Gerard Alarcon, and Robert J. Wycoff. Mr.

Mayton alleged that he was wrongfully arrested, and that during his arrest, the officers ignored

his complaints that he was ill. When Mr. Mayton began to struggle due to physical discomfort

from his illness, the officers used excessive force against him, resulting in a dislocated shoulder,

abrasions, and bruising. Because the officers ignored Mr. Mayton's complaints about his illness, he defecated in his clothing and was forced to remain sitting and lying on the ground in pain until transport arrived. Upon information and belief, the case was settled for an unknown amount.

67.     On August 5, 2005, Quincy Michael Shannon filed a lawsuit against the City and County of Denver, Denver Mayor John Hickenlooper, and Denver Police Officers Thomas McKibben and Chan Thanong. Mr. Shannon alleged that, while he and three friends were waiting in their car in a parking lot, they were approached by an officer who told them they could wait five more minutes for their friends to come out of a nightclub, and then they would have to move their car. Another officer then approached the car and told them to move. The driver attempted to move the car, but the parking lot was full of cars. A third officer then approached the car and sprayed mace or pepper spray into the driver's face. The driver tried again to move the car, but was unable to. Another officer then approached and sprayed the other occupants of the car with mace or pepper spray. All of the passengers then exited the car, which was filling up with fumes from the spray. Mr. Shannon asked Officer McKibben how they were supposed to move the vehicle when the parking lot was full, and in response Officer McKibben sprayed him in the face again. Mr. Shannon then walked away and dialed 911 to report the incident. Officer McKibben overheard Mr. Shannon describing him on the phone and sprayed him again. When Mr. Shannon turned away, Officer McKibben grabbed Mr. Shannon's arm and bent it behind him. Officer McKibben then kicked Mr. Shannon's feet out from under him and shoved his face into the pavement. Officer McKibben then grabbed both of Mr. Shannon's arms and one leg, handcuffing his hands behind his back over his ankle. Officers McKibben and Officer Thanong then picked Mr. Shannon up and sprayed him in the face again. Mr. Shannon suffered cuts and scrapes to his

face, resulting in a permanent scar. Upon information and belief, the case was settled for an unknown amount.

68.     On March 31, 2002, Mary Milham was at a Denver bar called Sing Sing, located in the LoDo section of downtown Denver. As Ms. Milham was leaving she made a remark about a particularly obnoxious bouncer to her brother. While talking to her brother, she was confronted with off-duty Denver Police Officers in police uniforms, one being Defendant Danny Perez, #95032. Ms. Milham was not being violent or threatening in any way when one of the officers grabbed Ms. Milham's wrist and applied a "low profile twist lock" on her and snapped her humerus like a twig while propelling her into a brick wall. This brutal assault caused extensive injuries to Ms. Milham as well as significant physical and psychological trauma. These officers then proceeded to file false charges against her knowing that she had committed no offense. All charges against Ms. Milham were dismissed in Denver County Court on August 14, 2002. A jury in federal court found Perez to be liable to Milham for violating her constitutional rights and using excessive force and damages were awarded. Despite this finding, Denver took no disciplinary action against Perez.

69.     On November 21, 2005, David Nettles filed a lawsuit against the City and County of Denver, Denver Police Chief Gerald Whitman, and Denver Police Officers Carlette Havard, Michael Nuanes, Jr., Damian Naranjo, and Zachary Phillips. Mr. Nettles alleged that the officers, while responding to a domestic violence call across the street from Mr. Nettles's house, decided to apprehend Mr. Nettles. In effectuating the unlawful arrest of Mr. Nettles, one of the officers began punching him in the ribs, while another used nunchucks on Mr. Nettles's ankle, causing him to fall to the ground. While Mr. Nettles was on the ground, another officer kicked him in the

18

head at least three times. One or more officers jumped onto Mr. Nettles's back, yelling, "when we give you an order, you obey it!" Another officer began punching Mr. Nettles in the back of the head, yelling, "you did it to your own damn self!" While the officers were attempting to handcuff Mr. Nettles's hands behind his back, he heard his shoulder snap. After he was handcuffed, the officers continued hitting him in the head and kicking him in the back. Mr. Nettles's injuries included a severe shoulder injury and bruising to his ribs, arms, left elbow, and knees. Upon information and belief, the case was settled for an unknown amount.

70.     On January 6, 2006, Francisco Juan Lobato, Anthony Lobato, Barbara Lobato, and Ramona Lobato filed a lawsuit on behalf of the estate of their father Frank Lobato against the City and County of Denver, Denver Police Chief Gerald Whitman, and Denver Police Officers Ranjan Ford, Jr., Joshua Herrick, Gene Sharla, Robert Shiller, Charles Kyle, Steven Addison, and unidentified John and Jane Doe Officers. The Lobatos alleged that the Defendant Officers entered the Lobato home using a ladder to enter the second floor of the home in the Lincoln Park Housing Project without a warrant looking for a suspect.  Children and adult witnesses told the officers that the suspect jumped out a window and left.  Nonetheless, the DPD Officers entered the apartment, threw open the door of the bedroom of Frank Lobato, an elderly disabled man, who was sleeping in his bed at the time the officers entered his room.  The Defendant Ford shot and killed Mr. Lobato claiming he mistook a pop can for a gun that he claimed was in his hand. Denver paid $900,000.00 in 2007 to settle the lawsuit.

71.     On April 3, 2006, Hirut Berhanmeskel filed a lawsuit against the City and County of Denver and Denver Police Officer Gilberto Romero. Ms. Berhanmeskel alleged that, while she was attempting to resolve a parking ticket dispute at the Denver Parking Ticket Referee's office,

she was approached by Officer Romero. Officer Romero, apparently upset that Ms.

Berhanmeskel was crying about her inability to resolve her parking ticket issue, grabbed Ms.

Berhanmeskel's arm violently and roughly twisted it behind her back. He slammed her against

the wall and handcuffed her without even warning her that he was placing her under arrest. Ms.

Berhanmeskel suffered a broken wrist as a result of the excessive force used by Officer Romero.

Upon information and belief, the case was settled for an unknown amount.

72.    On August 11, 2006, Chandler Lyles filed a lawsuit against the City and County

of Denver and Denver Police Officer Ryan Burke. Mr. Lyles alleged that Officer Burke came to

his home to investigate a claim that Mr. Lyles's mother was suicidal. Officer Burke ordered Mr.

Lyles to sit on a sofa in the living room, and Mr. Lyles complied. Then, without provocation or

warning, Officer Burke tackled Mr. Lyles, forcing him to the ground and handcuffing him. As a

result of the excessive force used by Officer Burke, Mr. Lyles suffered injuries that included a

broken right clavicle. Upon information and belief, the case was settled for an unknown amount.

73.    In 2007, Amy Shroff sued the City of Denver and Officer Frank Spellman for

violating her rights protected by the Fourth and Fourteenth Amendments to the Constitution.

Officer Spellman illegally arrested Ms. Shroff after she had complained to the police about her

former husband's presence at a bar immediately before he was to have visitation rights with their

young child under a custody arrangement that provided for her to drop the child off at the Denver

Police station for pick-up by the former husband. Officer Spellman arrested Ms. Shroff allegedly

for violating a restraining order, even though the order clearly restrained the *husband* from

coming near her, not her coming near her husband. The district court rejected Spellman's effort

to have the case dismissed on summary judgment, and the 10th Circuit Court of Appeals agreed

that Spellman's conduct, as alleged, would violate the clearly established rights of Ms. Shroff to be free from unreasonable searches and seizures. The Defendants settled the case before trial in 2010 for a payment of $175,000 to Ms. Shroff.

74.      On June 12, 2007, Ross Edward Smith filed a lawsuit against the City and County of Denver and Denver Police Officer Jarrod Tinnin and Deputy Sheriff Mark Sutton.  Mr. Smith alleged that while he was walking down the 16th Street Mall with a large photographic blow-up of Iraqi children maimed and killed as part of a protest against the Iraq War, he was beaten by Officer Tinnin.  Officer Tinnin had dismounted his motorcycle, and walked up to Mr. Smith and punched him in the face with a closed fist, throwing him to the pavement. Deputy Sheriff Sutton then joined Police Officer Tinnin in beating Mr. Smith who has Parkinson's Disease. Officer Tinnin pushed Mr. Smith's face into the pavement while Officer Sutton kneeled on Mr. Smith. Mr. Smith was charged with interference, but all charges against him were dropped. As a result of the excessive force used against him, Mr. Smith suffered injuries and abrasions to his face, arms, hands, neck, and back, and aggravation of his Parkinson's Disease, causing severe and uncontrollable tremors. The case was settled for $15,000.00.

75.      On June 27, 2007, Grace Arlene Mosley filed a lawsuit against the City and County of Denver and Denver Police Officers Martin Martinez, Jose Hurtado, and unknown John Doe Officers. Ms. Mosley alleged that she was unlawfully arrested and forcefully pulled out of her home by the officers. As a result of the excessive force against her, she suffered physical pain and emotional trauma. Upon information and belief, the case was settled for an unknown amount.

76.     In 2008, Denver paid $885,000 to settle a lawsuit brought in response to an incident in which Denver Police Officers Charles Porter, Luis Rivera, and Cameron Moerman used excessive force against Juan Vasquez, a 16 year-old boy. Mr. Vasquez was severely injured with a lacerated liver and broken ribs after one of the officers used a fence as leverage to jump up and down on the boy's back while he lay prone on the pavement.

77.     On November 13, 2008, Michael P. Marotta filed a complaint against the City and County of Denver, the Denver Police Department, and Denver Police Officers Cortez, Black, and Rocco-McKeel. Mr. Marotta's complaint arose out of two separate incidents with Denver Police Officers. In March 2007, Officer Cortez issued Mr. Marotta a summons for Disturbing the Peace for using the stairwells in his condominium building for exercise. When Officer Cortez was unable to serve Mr. Marotta, he obtained an arrest warrant. Officer Cortez then entered Mr. Marotta's condominium, pulling Mr. Marotta out and placing him under arrest. Mr. Marotta was locked out of his home without his hearing aid or glasses while his condominium was searched. In November 2007, Officer Rocco-McKeel came to Mr. Marotta's home, grabbing him and throwing him against a wall to effect an arrest. Mr. Marotta was handcuffed so tightly that he has a permanent scar on his wrist, and the officer shoved Mr. Marotta against an elevator wall without provocation while removing him from his building.

78.     In January 2009, Denver paid $100,000 to Trudy Trout to settle a lawsuit that arose out of Denver Police Officer Nicholas Rocco-McKee's use of excessive force. Officer Rocco-McKee shoved Ms. Trout to the ground, causing her to break her wrist. Despite the fact that the encounter was caught on video, Officer Rocco-McKee lied on his report, stating that Ms.

Trout tripped over her own high heeled shoes, which she was not wearing. Upon information and belief, Officer Rocco-McKee was not disciplined for the use of force or for lying on his report.

79.     On April 30, 2009, John Stephen Heaney filed a lawsuit against the City and County of Denver and Denver Police Officers James Costigan, Michael Cordova, Noel Ikeda, Luke Palmitere, and Daniel Steele. Mr. Heaney alleged that, while he was riding his bicycle near Coors Field on opening day of the baseball season, he was attacked by undercover police officers, who did not identify themselves as law enforcement agents. He was placed into a choke hold and forcibly brought to the ground, where he was punched in the head repeatedly. One of the officers grabbed him by the hair and slammed his face into the pavement, breaking two of his teeth. As a result of the excessive force used against him, Mr. Heaney also suffered severe bruising on his hands, knees, arms, and legs, as well as other injuries requiring surgery. The case was resolved by the parties.

80.     On May 4, 2009, Jason Anthony Graber filed a lawsuit against the City and County of Denver and Denver Police Officers Miller, Davis, and two other unknown John Doe Officers. Mr. Graber alleged that, as he was crossing the 16th Street Mall at Market Street, a police officer in a marked car yelled out his window, "dumbass!" The police car then pulled up next to Mr. Graber, his brother, and his wife, and asked if they needed assistance. Mr. Graber responded that they did not need assistance, but that he did not appreciate being called a dumbass. The officers then exited their vehicle and one of them tackled Mr. Graber from behind. He was grabbed by the neck, and his legs were kicked out from under him. He fell down, slamming his knee and elbow onto the concrete. Mr. Graber was arrested for public intoxication, but a breathalyzer test showed a blood alcohol content of 0.036, well below the legal limit, and

23

he was released. X-rays to Mr. Graber's leg showed lipohemarthrosis and a possible hairline fracture. Mr. Graber remained in a leg brace for many months after the incident. The case is currently awaiting trial in federal court before Senior Judge John Kane. Judge Kane has determined that Denver has improperly impeded appropriate discovery in this case by refusing to produce documents regarding previous uses of force by Denver law enforcement personnel. *See Graber v. City and County of Denver*, No. 09-cv-01029-JLK-MJW, 2011 U.S. Dist. LEXIS 82226 (July 27, 2011); *Graber v. City and County of Denver*, No. 09-cv-01029-JLK-MJW, 2011 U.S. Dist. LEXIS 99594 (Sept. 6, 2011).  The case settled for $225,000.00.

81.      On May 15, 2009, Altagracia Medina Valencia filed a lawsuit on behalf of her deceased husband against the City and County of Denver, Denver Police Chief Gerry Whitman, and eight unknown John Doe Denver Police Officers. Ms. Valencia alleged that, while her husband, Odiceo Valencia-Lopez, was attending his daughter's communion, he suffered a self-inflicted knife wound to the wrist. When his family called for an ambulance, the call was routed to Denver Police. Eight officers arrived on the scene. Mr. Valencia-Lopez was standing by his vehicle with the knife in his hand when he was surrounded by six to eight officers with their weapons drawn. The officers ordered Mr. Valencia-Lopez to drop the knife, but due to his lack of understanding of English, blood loss, and intoxication, he did not understand their commands. An officer then tased Mr. Valencia-Lopez, causing him to drop the knife. After Mr. Valencia-Lopez was tased and dropped the knife, the other officers began shooting him. He was shot approximately seven times, in front of his entire family. He died at the scene. Upon information and belief, the case was settled for an unknown amount.

82.     On October 16, 2009, Wayne C. Rose filed a lawsuit against the City and County of Denver, Denver Police Chief Gerald R. Whitman, Detective Mark S. Woodward, and unidentified John Doe Police Officers. Mr. Rose alleged that, while fleeing police unarmed, he was knocked to the ground by an officer on foot and then run over by an officer on a police motorcycle. The impact of the motorcycle knocked Mr. Rose unconscious, and Detective Woodward then handcuffed Mr. Rose's hands behind his back. Detective Woodward then picked Mr. Rose up by his arms and dropped him onto the pavement two or three times, causing his face and body to strike the pavement several times. Officer Woodward and the unidentified John Doe Officers then beat and kicked Mr. Rose repeatedly. Mr. Rose's injuries resulting from the officers' use of excessive force included a broken arm that required multiple surgeries. Upon information and belief, the case was settled for an unknown amount.

83.     On June 30, 2009, James R. Watkins filed a lawsuit against the City and County of Denver and Denver Police Officers John Ruddy and Randy Penn. Mr. Watkins alleged when he noticed he was being followed by the officers, he reached for his cell phone while asking them if they were going to beat him up. The officers responded by lunging toward Mr. Watkins and hitting him in the face with their closed fists and elbows. They continued beating him after he was on the ground and under police control. Mr. Watkins had to be taken by ambulance to Denver Health Medical Center because he was bleeding profusely as a result of the officers' use of excessive force. He was initially charged with Assault in the Second Degree, but all charges against him were dropped. Denver paid Mr. Watkins $20,000 to settle the lawsuit.

84.     On June 30, 2009, Michael DeHerrera filed a lawsuit against the City and County of Denver and Denver Police Officers Devin Sparks, A. Jaramillo, and R. Murr. Mr. DeHerrera

alleged that, while he was using his cell phone to inform his father, a Pueblo police officer, that the Denver Police Officers were assaulting his friend, the officers assaulted him. Officer Sparks used an arm bar takedown to force Mr. DeHerrera face first onto the sidewalk. Once Mr. DeHerrera was on the ground, Officer Sparks used a sap impact weapon repeatedly on Mr. DeHerrera's body, and other officers struck him in the face multiple times. Mr. DeHerrera had to be taken to the hospital by ambulance, and his injuries included head trauma and facial contusions. This incident was captured on video. Since the case has received considerable publicity and public protest, the Denver Police Department ultimately terminated Officer Sparks and Randy Murr and their termination was upheld by the Denver Civil Service Commission. In January, 2014 both officers appealed their termination to Denver District Court. The incident resulted in a $17,500 settlement for each of the victims.

85.     On June 30, 2009, Shawn Kyeone Johnson filed a lawsuit against the City and County of Denver and Denver Police Officers Devin Sparks, A. Jaramillo, and R. Murr. Mr. Johnson was involved in the altercation with Denver Police that resulted in Mr. DeHerrera's lawsuit. Mr. Johnson alleged that, as he was being assaulted by a club bouncer, three Denver Police Officers joined in the assault, striking him in the face with elbows and closed fists even after he was under police control. Mr. Johnson suffered severe injuries, including head trauma and facial contusions, and was taken by ambulance to the hospital. In August 2010, Denver settled the case for $15,500.15.

86.     On August 7, 2009, James B. Bouchard filed a lawsuit against the City and County of Denver and Denver Police Officers M. Whetstone and K. Jiminez. Mr. Bouchard alleged that the officers arrived at his house in response to a call by Mr. Bouchard's former

girlfriend, who wanted to retrieve her personal belongings from his house. When Mr. Bouchard refused to allow the officers to enter his home without a warrant, the officers forced their way in and used a nightstick to restrain Mr. Bouchard in his own home. He was then shoved into a wall and handcuffed. Mr. Bouchard's resulting injuries included a torn rotator cuff and bruises, contusions, and other injuries to his upper torso, face, and head. The case is currently awaiting trial in federal court.

87.     On August 10, 2009, Danvis Smith filed a lawsuit against the City and County of Denver, Denver Police Chief Gerald Whitman, Denver Manager of Safety Alvin LaCabe, and Denver Police Officer Joseph P. Flynn. Mr. Smith alleged that he was involved in an altercation with Officer Flynn, who was working on foot in the Denver International Airport parking garage. Officer Flynn reached through the driver's side window and struck Mr. Smith in the mouth with his elbow. Officer Flynn then pulled Mr. Smith out of the car by his right arm and handcuffed Mr. Smith in an awkward position, with his arms lifted high in the air beyond the normal range of motion. Mr. Smith was charged with assault, but all charges against him were subsequently dropped. Mr. Smith's injuries included a torn rotator cuff, a torn biceps tendon, and chronic back pain. Upon information and belief, the case was settled for an unknown amount.

88.     In September 2009, Denver settled a wrongful death lawsuit for $225,000 to the family of Alberto Romero, who died after being repeatedly tasered and beaten with impact weapons by police when he was arrested wearing only boxer shorts. Before he died, Mr. Romero suffered eight broken ribs and had his tongue split open from the use of excessive force.

89.     On December 29, 2009, Vicki Lynn Trujillo filed a lawsuit on behalf of the Estate of her husband Jason Gomez against the City and County of Denver, Denver Police Chief Gerald Whitman, and Denver Police Officer Timothy Campbell. Ms. Trujillo alleged that Officer Campbell began chasing Mr. Gomez on foot several blocks without reasonable suspicion or probable cause. When Officer Campbell confronted Mr. Gomez, as he had fallen and was kneeling on the ground, Campbell pointed his gun at him. Officer Campbell repeatedly shouted that he was going to kill Mr. Gomez. When Mr. Gomez, who was unarmed, stood up and began running from Officer Campbell, Officer Campbell shot him in the back. The bullet perforated Mr. Gomez's spinal column. Officer Campbell went up to Gomez as he was down from the first shot and fired a second round of shots, hitting Mr. Gomez twice in the chest, once in the abdomen, once in the right thigh, and once in the left knee.  Officer Campbell claimed that Gomez had a small cigarette lighter in his hand that he mistook for a gun.  Mr. Gomez died from multiple gunshot wounds. The case settled for $190,000.00.

90.     On March 16, 2010, Mark Ashford was walking his dogs when he witnessed Denver Police Officers pull over a driver for allegedly going through a stop sign. When Mr. Ashford informed the driver that he would be willing to testify that he saw the driver come to a complete stop, the officers focused on Mr. Ashford. When he began taking pictures of the scene, the officers attempted to wrestle the camera from Mr. Ashford, pushing, grabbing, and punching him to get him to the ground. Mr. Ashford was charged with interference and resistance, but the charges were later dismissed. Mr. Ashford was transported from the scene by ambulance. He subsequently filed an excessive force complaint with the Denver Police Department.  In June 2011, Denver settled the case for $35,000.00.

91.     On March 19, 2010, James D. Moore filed a lawsuit against the City and County

of Denver and Denver Police Officers Shawn Miller and John Robledo. Mr. Moore alleged that

Officers Miller and Robledo arrived at his apartment complex in response to a 9-1-1 call from his

neighbor reporting a noise coming from Mr. Moore's apartment. When the officers arrived, Mr.

Moore and his girlfriend were standing outside of his apartment. After instructing Mr. Moore,

whose hands were not in his pockets, to remove his hands from his pockets, the officers tackled

Mr. Moore from behind and struck him on the head without provocation or warning. While he

was on the ground, Mr. Moore was beaten so brutally that he lost consciousness and his heart

stopped. CPR had to be administered to save his life. The beating continued even after Mr.

Moore was restrained, despite his repeated insistence that the officers had "the wrong guy." Mr.

Moore suffered debilitating injuries as a result of his assault. He had to undergo back surgery and

months of physical rehabilitation, and he now walks with a cane and cannot stand up for more

than ten minutes without having to sit or lie down due to pain. The case is currently awaiting trial

in federal court.

92.     In May 2010, Denver settled a lawsuit filed by Eric Winfield for $40,000. Mr.

Winfield alleged that he was severely beaten by Denver Police Officers Antonio Milow, Thomas

Johnston, and Glen Martin while he was making his way through LoDo crowds after a 2007

World Series game. Mr. Winfield's injuries included chipped teeth, permanent scars, and nerve

damage in his hands.

93.     In June 2010, John Crespin filed a lawsuit against the City and County of Denver

and Denver Police Officers Steven Castro, Todd Allum, Eric Sellers, and Joey Gasca. According

to the lawsuit and media accounts, the officers followed 17-year-old Crespin home after he

witnessed them using excessive force on a group of kids. Witnesses saw the officers kick

Crespin's legs out from under him, use a choke hold on him, cuff him, and beat him with police

batons for 15-20 minutes.  In January, 2012 the case settled for an undisclosed amount.

94.     In June 2010, Tyler Mustard filed a lawsuit against the City and County of Denver

and Denver Police Officers Michael Morelock and Kimberly Thompson. Mr. Mustard alleged

that Officer Morelock chased him on foot, tackled him to the ground, and beat him in the head,

neck, and body. The Officers alleged that Mr. Mustard was spray painting a van and assaulted an

officer; the criminal case against Mr. Mustard was dismissed. Denver has agreed to settle the

case for $117,000. 20.

95.     In August 2010, Chad Forte was paid $22,500.00 to settle a lawsuit resulting from

Denver Police Officer Kenneth Johnson's use of excessive force. After Mr. Forte allegedly

jaywalked, Officer Johnson followed him into his apartment building and attacked him from

behind, leaving him with facial injuries.

96.     On September 20, 2010, Rohit Mukherjee filed a lawsuit against Denver Police

Officer Abbegayle Dorn and two unknown John Doe Denver Police Officers. Mr. Mukherjee

alleged that Denver Police Officers knocked on his door while he was hosting a party in his

apartment. One of the officers asked Mr. Mukherjee to step outside. When he refused, one of the

officers pushed his way into the apartment and Officer Dorn pinned Mr. Mukherjee against the

door and choked him. When Mr. Mukherjee informed the officers that he could not breathe, one

of them threw him to the ground, face first. One of the officers stood on Mr. Mukherjee's ankle

and rocked back and forth. After Mr. Mukherjee was restrained, the officers pushed him face first

on the carpeted floor, causing contusions to his face. Mr. Mukherjee's guests then began recording the use of excessive force with their cell phones, at which point Officer Dorn took the cell phones without permission and placed them in a bowl of water in the kitchen in order to destroy the photographic and video evidence of the police behavior. While Mr. Mukherjee was still restrained, the other officers stepped on and kneed Mr. Mukherjee's face and bent his fingers backwards as far as they could without breaking them. While escorting Mr. Mukherjee out of his apartment, the officers slammed his head into the hallways walls and the elevator wall. Mr. Mukherjee's injuries included jaw injuries, bruises, hand and knee pain, lacerations, knee contusion, hand sprain, and nerve damage. The case settled in October, 2011 for an undisclosed amount.

97.    On November 23, 2010, Jared Lunn filed a lawsuit against the City and County of Denver, Denver Police Officer Eric Sellers, and unknown Denver Police Officer John Doe. Mr. Lunn alleged that after he attempted to report an assault to Officer Sellers, which Officer Sellers ignored, Officer Sellers assaulted him. Mr. Lunn was attempting to get into his friend's vehicle when he muttered, "way to protect and serve," in response to Officer Sellers' refusal to take his assault report seriously. Officer Sellers then wrapped his arm around Mr. Lunn's neck to pull him out of the car. Officer Sellers placed Mr. Lunn in a carotid compression hold. After Mr. Lunn went limp, Officer Sellers kicked his legs out from under him and threw him to the ground. After handcuffing Mr. Lunn, Officer Sellers got within inches of Mr. Lunn's face and yelled homophobic epithets at him. Officers Sellers then released Mr. Lunn without citing him for violation of any law and allowed him to go home. In June 2011, Denver settled the case for $45,000.22.

31

98.     On January 12, 2011, Daniel Martinez, Jr., Nathan Martinez, Daniel Martinez III, and Jonathan Martinez (collectively, "the Martinez Family") filed a lawsuit against the City and County of Denver, Denver Police Chief Gerald Whitman, and Denver Police Officers Jason Valdez, Robert Martinez, Robert Motyka, and Bryce Jackson. The Martinez Family alleged that the officers began pounding on their door shortly after 11:00 pm, demanding that they open the door. When Daniel Martinez, Jr. opened the door slightly, the officers rushed into the house without consent or a warrant. Officer Valdez slammed Jonathan Martinez's head through a window and then pulled him outside of the house and slammed him onto the concrete to apply handcuffs. Officer Martinez pushed Daniel Martinez into the living room, pinned him against the sofa, and applied handcuffs. Officer Motyka punched Nathan Martinez in the face without any provocation. Officer Jackson forcefully dragged Daniel Martinez III from the house and slammed him into the concrete before applying handcuffs. All of the Martinez Family members were criminally charged. A jury acquitted Nathan Martinez and Daniel Martinez III on all charges. All of the charges against Daniel Martinez, Jr. and Jonathan Martinez were dropped. The case is currently set for jury trial to commence on September 15, 2014.

99.     On January 11, 2011, Alexander Landau filed a lawsuit against the City and County of Denver, Denver Police Chief Gerald Whitman, and Denver Police Officers Randy Murr, Ricky Nixon, and Tiffany Middleton. Mr. Landau alleged that he was assaulted during a traffic stop. Mr. Landau was driving with Addison Hunold when he was pulled over. Mr. Landau did not have his wallet, so he could not provide any identifying information to the officers. He exited the car as instructed. Mr. Hunold informed the officers that he had a small amount of marijuana and he was placed in handcuffs. The officers began searching Mr. Landau's car. When they tried to

open the trunk, Mr. Landau asked if they had a warrant authorizing a search of the trunk. Two of

the officers then grabbed each of Mr. Landau's arms, and a third officer punched him in the face

with no provocation. One of the officers then yelled that Mr. Landau was going for a gun, even

though he was not, and the officers continued to beat him in the face and head with their fists, a

radio, and a flashlight. Racist epithets were spewed at Mr. Landau, who is African American.

More officers arrived on the scene and joined the assault. Officer Murr pointed his gun at Mr.

Landau's head and threatened to shoot him. Paramedics arriving on the scene documented that

Mr. Landau was found lying prone on the curbside, handcuffed behind his back, bleeding from

the head, with lacerations and in acute distress. Mr. Landau was transported by ambulance to the

hospital, where he was treated for a broken nose, lacerations, and serious closed head injuries,

including a large hematoma, a concussion, and a hemorrhage in his right eye. The case settled for

$795,000.00.

     100.    On December 22, 1996, Manuel Moreno-Delgado was shot and killed by Denver

Police Officer Michael Pace who was awarded a medal of honor for this killing. Officer Pace

was off-duty driving his private vehicle and became involved in a road rage situation with Mr.

Moreno-Delgado at approximately 2:00 a.m. as they were traveling north on Colorado Boulevard

with Officer Pace claiming that Mr. Moreno-Delgado would not let him into the left lane so he

could get on I-70. Mr. Moreno-Delgado allegedly pointed an unloaded gun at Officer Pace who

he did not know was a police officer due to dark tinted windows on Officer Pace's private

vehicle. Officer Pace fired four shots allegedly from his moving vehicle, three of which struck

Mr. Moreno-Delgado and all three shots were fatal. Officer Karon Price was also off duty in his

private vehicle and had sandwiched Mr. Moreno-Delgado's vehicle on Colorado Blvd with

Pace's vehicle in front and Karon Price's vehicle in the rear of Mr. Moreno's vehicle.  Both

Officer Pace and Officer Price lied about how the shooting occurred.  The Denver Public Safety

review Commission paid their own expert witnesses and determined that the shots that were fired

by the Defendant Pace could not have been fired from his vehicle as he claimed.  Also, shards of

glass were on top of the gun tucked into Mr. Moreno's crotch proving that the gun was not

pointed at Officer Pace as he claimed when Pace fired through Mr. Moreno's closed window

killing him.  There were no other independent eye witnesses to this incident.  Settlement after

suit filed: $75,000.00

101.    On July 16, 2005, Plaintiff, Nicole Lumpkin was groped and sexually assaulted

while working as a transportation security screener for the Transportation Security

Administration (TSA), by Denver Police officer Rodney Clark who had previous complaints of

sexual assault.  The case settled in 2009 for $48,000.00.

102.    On March 5, 2004 Linda Moiseyev a 56 year old woman was stopped for speeding

by Denver Police Officer Daniel "Denny" Dunn.  When Ms. Moiseyev insisted on filing a

complaint against Officer Dunn he arrested Ms. Moiseyev and charged her with Assault to

Defendant Dunn, Resisting Arrest, Interference, Disobedience to a Police Officer and Speeding.

Ms. Moiseyev was acquitted of all but the speeding charge.  Ms. Moiseyev said that Officer

Dunn touched her in a sexual manner with his crotch and threw her to the ground twisting her

arms causing her severe injury.  After filing a civil suit the case settled for $50,000.00.

103.    On January 4, 1998  Elvia Gonzalez was kidnaped and then sexually assaulted by

Denver Police Officer Daniel Pollack, who had sexually assaulted at least two other women who

filed a lawsuit against him and the City and County of Denver.  In 2003 Ms. Gonzales accepted a

34

settlement in the amount of $210,000.00.  The other two women, Venita Allen and Tiffany

McConnell accepted similar amounts.  Ms. McConnell settled for $250,000.00 due to the fact

that the officer forced her to perform oral sex on him or he would arrest and jail her.  Elvia

Gonzalez is Hispanic/Latino and Ms. Allen and Ms. McConnell are African American/Black.

Officer Pollack's police log reports and use of NCIC showed he stopped young women and

demanded sex in return for not arresting or charging them on bogus charges.

104.    These cases provide only representative examples of the rampant use of excessive

force, frequently deadly, by Denver law enforcement officers and the lack of any training,

supervision and discipline on the part of the City and County of Denver to prevent this dangerous

and unconstitutional conduct.

## FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Excessive Force-Cruel and Unusual Punishment in Violation
### of the Fourth, Eighth and Fourteenth Amendments
### (Against Defendant Lovingier and the City and County of Denver)

105.    That the Plaintiff hereby incorporates by reference, for all purposes herein, as if

fully set forth verbatim, paragraphs 1 through 104 of this Complaint.

106.    At the time of the complained of events, Plaintiff Mr. Waller had a

constitutionally protected and clearly established right under the Fourth and Eighth Amendments

to be free from excessive force amounting to cruel and unusual punishment and a clearly

established Constitutional right under the Fourteenth Amendment to bodily integrity and to be

free from excessive force by law enforcement.

35

107.    Any reasonable law enforcement officer or deputy sheriff knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time.

108.    Defendants Lovingier unjustifiably used excessive force and inflicted unnecessary and willful and wanton pain on Plaintiff Waller by means of excessive physical force thereby inflicting cruel and unusual punishment against him.

109.    Defendant Lovingier's actions, as described above, were objectively unreasonable in light of the facts and circumstances confronting them.

110.    Defendant Lovingier's actions, as described above, were undertaken intentionally, maliciously and sadistically to cause harm and injury to Plaintiff Waller.

111.    Defendant Lovingier's actions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Plaintiff Waller's constitutionally protected rights.

112.    Defendant Lovingier's conduct violated clearly established rights belonging to Plaintiff Waller of which reasonable law enforcement knew or should have known.

113.    Plaintiff Waller has been and continues to be damaged by Defendant Lovingier's use of excessive force against him.

114.    The acts or omissions of each Defendant, including the unconstitutional policy, procedure, custom, and/or practice described herein, were the legal and proximate cause of Plaintiff Waller's damages.

115.    As a direct result of Defendants' unlawful action as described above, Plaintiff Waller suffered actual physical, emotional, and economic injuries in an amount to be proven at trial.

116.    Defendant Denver's failure to train, supervise, and/or discipline on matters of excessive force and use of force generally, as described herein, was a legal and proximate cause of Plaintiff Waller's injuries.

117.    Defendant Denver failed to properly train, supervise and/or discipline its employees regarding use of excessive force and the constitutional rights of persons which continues to be the moving force and proximate cause of the violation of Mr. Waller's constitutional rights and the rights of other inmates.

118.    Defendant Lovingier, at all times relevant hereto, was acting under color of state law in his capacity as Deputy Sheriff for the City and County of Denver.

119.    The acts and omissions of Defendants were engaged in pursuant to the custom, policy, and practice of Defendant Denver, which encourages, condones, tolerates, and ratifies the use of excessive force by law enforcement officers in the City and County of Denver.

120.    The acts or omissions of each of the Defendants was the proximate cause of Mr. Waller's injuries in that he suffered an assault and battery while appearing in Denver County Court.

121.    The conduct in violating Mr. Waller's rights were wanton, willful and accompanied by malice and so intolerable to society's standard of fundamental fairness that it is shocking to the conscious and violates Mr. Waller's Eighth and Fourteenth Amendment rights to be free from cruel and unusual punishment.

37

122.    That Defendant Lovingier's actions as described above were  attended by circumstances of malice, wanton and reckless disregard of the Plaintiff's rights and feelings and the Plaintiff is entitled to an award of exemplary damages against the Defendants.

123.    That as a result of Defendant Lovingier's actions the Plaintiff Waller has been denied his  civil rights and Mr. Waller has sustained injuries including, but not limited to severe bodily injuries to his head, including a deep head laceration, closed head injury and left orbital blowout fracture and injuries to his back, neck, legs, arms, ankles, including a hernia and his teeth were knocked out, extreme anxiety, mental anguish, emotional distress, depression, loss of enjoyment of life, loss of his civil rights and other permanent injuries all to his damage.

124.    That as a further, direct and proximate result of Defendant Lovingier's actions the Plaintiff has incurred doctor bills, medicine bills, counseling and therapy bills, attorney's fees and costs, loss of value of his time, loss of full enjoyment of life, all of which is still occurring and Plaintiff prays for damages in the amount of $5,000,000.

**WHEREFORE,** the Plaintiff prays for judgment for general damages against the Defendant Denver and against Defendant Lovingier individually, and as a deputy sheriff of the City and County of Denver and for exemplary damages, interest from the date of Plaintiff's injuries, expert witness fees, costs, attorneys fees and for such other, further, and additional relief as this Court may deem just and proper.

### SECOND CLAIM FOR RELIEF
**42 U.S.C. § 1983**
**Violation of the Plaintiff's Sixth Amendment Rights**
**(Against Defendant Lovingier and the City and County of Denver)**

125.    That the Plaintiff hereby incorporates by reference, for all purposes herein, as if fully set forth verbatim, paragraphs 1 through 124 of this Complaint.

38

126.    Mr. Waller had a constitutional right under the Sixth Amendment to the United States Constitution to appear in court, to be advised of his rights including the right to be able to ask questions of the court without being brutally attacked, beaten and dragged from the courtroom.

127.    Any reasonable law enforcement officer or deputy sheriff knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time.

128.    Defendant's actions, as described above, were objectively unreasonable in light of the facts and circumstances confronting them.

129.    Defendants' actions, as described above, were undertaken intentionally, maliciously and brutally to cause harm and injury to Plaintiff Waller.

130.    Defendants' actions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Plaintiff Waller's constitutionally protected rights.

131.    Defendants' conduct violated clearly established rights belonging to Plaintiff Waller of which reasonable law enforcement knew or should have known.

132.    The acts or omissions of each Defendant, including the unconstitutional policy, procedure, custom, and/or practice described herein, were the legal and proximate cause of Plaintiff Waller's damages.

133.    As a direct result of Defendants' unlawful action as described above, Plaintiff Waller suffered actual physical, emotional, and economic injuries in an amount to be proven at trial.

134.     Defendant Denver's failure to train, supervise, and/or discipline on matters of excessive force and use of force generally, as described herein, was a legal and proximate cause of Plaintiff Waller's injuries.

135.     Defendant Denver failed to properly train, supervise and/or discipline its employees regarding use of excessive force and the constitutional rights of persons which continues to be the moving force and proximate cause of the violation of Mr. Waller's constitutional rights and the rights of other inmates.

136.     Defendant Lovingier, at all times relevant hereto, was acting under color of state law in his capacity as Deputy Sheriff for the City and County of Denver.

137.     The acts and omissions of Defendants were engaged in pursuant to the custom, policy, and practice of Defendant Denver, which encourages, condones, tolerates, and ratifies the use of excessive force by law enforcement officers in the City and County of Denver.

138.     The acts or omissions of each of the Defendants was the proximate cause of Mr. Waller's injuries in that he suffered an assault and battery while appearing in Denver County Court.

139.     The conduct in violating Mr. Waller's rights were wanton, willful and accompanied by malice and so intolerable to society's standard of fundamental fairness that it is shocking to the conscious and violates Mr. Waller's Sixth Amendment right to be advised of the charges against him and to appear in court and ask questions of the court without being brutally beaten, assaulted battered and dragged from the courtroom.

140.     That Defendant Lovingier's actions as described above were  attended by circumstances of malice, wanton and reckless disregard of the Plaintiff's rights and feelings and

the Plaintiff Waller is entitled to an award of exemplary damages against the Defendants.

141.    That as a result of Defendant Lovingier's actions the Plaintiff Waller has been denied his civil rights and the Plaintiff has sustained injuries including, but not limited to severe bodily injuries to his head, including a deep head laceration, closed head injury and left orbital blowout fracture and injuries to his back, neck, legs, arms, ankles, including a hernia and his teeth were knocked out, extreme anxiety, mental anguish, emotional distress, depression, loss of enjoyment of life, loss of his civil rights and other permanent injuries all to his damage.

142.    That as a further, direct and proximate result of Defendant Lovingier's actions the Plaintiff Waller has incurred doctor bills, medicine bills, counseling and therapy bills, attorney's fees and costs, loss of value of his time, loss of full enjoyment of life, all of which is still occurring and Plaintiff prays for damages in the amount of $5,000,000.

**WHEREFORE,** the Plaintiff prays for judgment for general damages against the Defendant Denver and against Defendant Lovingier individually, and as a deputy sheriff of the City and County of Denver and for exemplary damages, interest from the date of Plaintiff's injuries, expert witness fees, costs, attorneys fees and for such other, further, and additional relief as this Court may deem just and proper.

### THIRD CLAIM FOR RELIEF
**42 U.S.C. § 1983**
**Failure to Train, Supervise and Discipline**
**(Against Defendant City and County of Denver)**

143.    That the Plaintiff hereby incorporates by reference, for all purposes herein, as if fully set forth verbatim, paragraphs 1 through 142 of this Complaint.

144.     Defendant Denver failed to properly train, supervise and discipline its employees and to otherwise monitor and protect inmates and avoid the use of excessive force.

145.     Defendant Denver knew, or should have known, that its employees would fail to monitor and protect inmates, and use unreasonable force, violating inmates' constitutional rights.

146.     Defendant Denver has continuously for decades failed in its supervisory duties, to adequately train, supervise and discipline law enforcement officers, including Deputy Sheriffs and Police Officers in regard to the appropriate use of force.  Such failure is a custom, policy, or practice of Defendant Denver and a driving force behind Mr. Waller's constitutional violations as described herein.

147.     Defendant Denver was deliberately indifferent to the constitutional rights of persons in the care and custody of the Denver Sheriff's Department and persons detained at the Denver Detention Center by failing to properly monitor, train, supervise, discipline, and timely investigate its employees for use of excessive force and unreasonable and unjustified use of force and assaultive conduct on inmates.  Defendant Denver could have and should have pursued reasonable methods for proper and adequate training, supervision and discipline of such employees, but has failed to do so.  It is not only ironic but demonstrates complete lack of proper training on the proper use of force since Defendant Lovingier was a trainer for the DSD in regard to use of force both at the time he assaulted the Plaintiff Waller and subsequently.

148.     Denver developed and maintained law enforcement related policies, procedures, customs, and/or practices exhibiting or resulting in a deliberate indifference to the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendment protected constitutional rights of persons in the City and County of Denver, which proximately caused the violation of Plaintiff's constitutional rights.

149.    Mr. Waller had a constitutional right under the Sixth Amendment to appear in court, to be advised of his rights and to ask questions of the court without being brutally attacked and dragged from the courtroom.

150.    Mr. Waller had a Fifth Amendment right not to be deprived of life or liberty without due process of law.

151.    In light of the duties and responsibilities of those law enforcement officers that participate in providing safety and security for pretrial detainees, the need for specialized training and supervision is patent, and the inadequacy of training and/or supervision within the DSD is likely to result in the violation of constitutional rights of other inmates such as those described herein.

152.    Denver is liable for their failure to train and to appropriately supervise and discipline officers of the DSD.

153.    The inadequate training, supervision and discipline provided by Denver are a result of conscious or deliberate choice to follow a course of action that the Defendant Denver knows would result in constitutional violations against Mr. Waller and other inmates in the Denver jails.

154.    Proper and adequate training was not given to Defendant Lovingier concerning the civil rights of pretrial detainees to be free from constitutional violations, specifically Fourth, Fifth, Sixth, Eighth and Fourteenth Amendment violations.  Denver knew or should have known that the training, if any, was deficient and that the use of excessive force was inevitable.

155.    Proper and adequate training was not given to Defendant McCall concerning the civil rights of pretrial detainees to be free from constitutional violations, specifically Fourth,

Fifth, Sixth, Eighth and Fourteenth Amendment violations.  Denver knew or should have known that the training, if any, was deficient and that the use of excessive force was inevitable

156.    Denver has a duty to protect the constitutional rights of the members of the public who are inmates in the Denver jails from violations of those rights by members of its Sheriff's Department.  See C.R.S. § 17-26-104.

157.    As a direct and proximate cause and consequence of Denver's failure to train, supervise and discipline, Plaintiff Waller was denied his civil rights and Mr. Waller has sustained injuries including, but not limited to severe bodily injuries to his head, including a deep head laceration, closed head injury and left orbital blowout fracture and injuries to his back, neck, legs, arms, ankles, including a hernia and his teeth were knocked out, extreme anxiety, mental anguish, emotional distress, depression, loss of enjoyment of life, loss of his civil rights and other permanent injuries all to his damage.

158.    That as a further, direct and proximate result of Defendants actions the Plaintiff has incurred doctor bills, medicine bills, counseling and therapy bills, attorney's fees and costs, loss of value of his time, loss of full enjoyment of life, all of which is still occurring and Plaintiff prays for damages in the amount of $5,000,000.

**WHEREFORE,** the Plaintiff prays for judgment for general damages against the Defendant Denver and for exemplary damages, interest from the date of Plaintiff's injuries, expert witness fees, costs, attorneys fees and for such other, further, and additional relief as this Court may deem just and proper.

## FOURTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Fourth, Fifth, Sixth and Fourteenth
### Amendment Violation–Malicious/Vindictive Prosecution
### (Against all Defendants)

159.     That the Plaintiff hereby incorporates by reference, for all purposes herein, as if fully set forth verbatim, paragraphs 1 through 158 of this Complaint.

160.     Defendants were acting under color of state law in their actions and inactions which occurred at all times relevant to the claims brought by the Plaintiff.

161.     Defendants violated Mr. Waller's Plaintiff's Fourth, Fifth, Sixth and Fourteenth Amendment rights to be free from malicious/vindictive prosecution without probable cause and without due process when they worked in concert to secure and further pursue false charges against Mr. Waller, resulting in his unlawful confinement and prosecution.

162.     Defendants Lovingier and McCall conspired and/or acted in concert to institute criminal proceeding against the Plaintiff Mr. Waller without probable cause and sought to obtain a conviction against him in an attempt to insulate Defendants from scrutiny and potential criminal and civil liability.

163.     Defendants Lovingier, McCall and Denver made the decision to target Plaintiff Waller for criminal charges and/or prosecution.

164.     Defendants Lovingier and McCall and Denver engaged in the conduct described by this Complaint willfully, maliciously, in bad faith, and in reckless disregard of Plaintiff's federally protected constitutional rights.

165.     Defendants Lovingier and McCall's repeated efforts finally succeeded in charging the Plaintiff Mr. Waller with Resisting Police Authority, D.R.M.C. § 38-32(b) when these

Defendants knew these criminal allegations against Mr. Waller was known to be false allegations was malicious, shocking, and objectively unreasonable in the light of the circumstances.  There was video, audio and witnesses including a judge and her staff that these charges were false.

166.    Defendants Denver's failure to train, supervise and/or discipline as described herein, was a legal and proximate cause of the Plaintiff Waller's injuries.

167.    That as a result of Defendants Lovingier, McCall and Denver's actions the Plaintiff Mr. Waller has been denied his civil rights and Mr. Waller has sustained injuries including, but not limited to severe bodily injuries to his head, including a deep head laceration, closed head injury and left orbital blowout fracture and injuries to his back, neck, legs, arms, ankles, including a hernia and his teeth were knocked out, extreme anxiety, mental anguish, emotional distress, depression, loss of enjoyment of life, loss of his civil rights and other permanent injuries all to his damage.

168.    That as a further, direct and proximate result of Defendants Lovingier, McCall and Denver's actions the Plaintiff has incurred doctor bills, medicine bills, counseling and therapy bills, attorney's fees and costs, loss of value of his time, loss of full enjoyment of life, all of which is still occurring and Plaintiff prays for damages in the amount of $5,000,000.

**WHEREFORE,** the Plaintiff prays for judgment for general damages against the Defendant Denver and Defendants Lovingier and McCall individually, jointly and severally and as Deputy Sheriffs of the City and County of Denver and for exemplary damages, interest from the date of Plaintiff's injuries, expert witness fees, costs, attorneys fees and for such other, further, and additional relief as this Court may deem just and proper.

## FIFTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983 & 1985
### Conspiracy to Violate Civil Rights
### (Against all Defendants)

169.    That the Plaintiff hereby incorporates by reference, for all purposes herein, as if fully set forth verbatim, paragraphs 1 through 168 of this Complaint.

170.    That the Defendants Lovingier and McCall did conspire and agree between and among themselves to a series of formal and informal policies and practices adopted by the Defendant, the City and County of Denver through its official and unofficial decision making channels to deny the Plaintiff and other African American/Black and/or  Hispanic/Latinos of their rights, immunities, privileges and liberties as guaranteed by the laws and Constitution of the United States of America and the laws and Constitution of the State of Colorado and by Title 42 U.S.C.  §§ 1983 and 1985 as set forth fully above in Plaintiff's Complaint.

171.    That as a result of these formal and informal policies and practices, Defendants Lovingier and McCall were allowed to assault and batter Mr. Waller, an African American/Black man, and prevent him from asking questions of the court and then to maliciously prosecute Mr. Waller on false charges to cover up the Defendants' constitutional violations.  That as a result of these formal and informal practices and failure to act by the Defendant the City and County of Denver, the Plaintiff has been damaged as well as other African American/Black and Hispanic/Latinos have been subjected to assaults, batteries and malicious prosecutions.

172.    That Defendants Lovingier's and McCall's actions as described above were attended by circumstances of malice, wanton and reckless disregard of the Plaintiff's rights and feelings and the Plaintiff is entitled to an award of exemplary damages against the Defendants.

173.    That as a result of the conspiracy of Defendants Lovingier and McCall Mr. Waller the Plaintiff has been denied his civil rights and Mr. Waller has sustained injuries including, but not limited to severe bodily injuries to his head, including a deep head laceration, closed head injury and left orbital blowout fracture and injuries to his back, neck, legs, arms, ankles, including a hernia and his teeth were knocked out, extreme anxiety, mental anguish, emotional distress, depression, loss of enjoyment of life, loss of his civil rights and other permanent injuries all to his damage.

174.    That as a further, direct and proximate result of Defendants Lovingier and McCall's actions the Plaintiff Waller has incurred doctor bills, medicine bills, counseling and therapy bills, attorney's fees and costs, loss of value of his time, loss of full enjoyment of life, all of which is still occurring and Plaintiff prays for damages in the amount of $5,000,000.

**WHEREFORE,** the Plaintiff prays for judgment for general damages against the Defendant Denver Defendants Lovingier and McCall individually, jointly and severally, and as deputy sheriffs of the City and County of Denver and for exemplary damages, interest from the date of Plaintiff's injuries, expert witness fees, costs, attorneys fees and for such other, further, and additional relief as this Court may deem just and proper.

## INJUNCTIVE RELIEF

175.    The brazenness of Defendant Lovingier in beating and dragging Mr. Waller from the courtroom for politely asking a question of the judge upon being advised of his rights, coupled with the blatant attempt by the Defendants McCall and Lovingier to cover up this incident by demanding that Mr. Waller be charged with a crime despite clear evidence from the video and the judge and courtroom staff's statements verifying that Mr. Waller had not

committed any crime, clearly demonstrates that deputy sheriffs in the DSD's use excessive force on a routine and continuing bases, with supervisory knowledge and assistance to cover up all complaints and this conduct is widespread and continues unabated within the DSD.

176.    For decades the Defendant the City and County of Denver has been incapable of stopping the use of excessive force by its law enforcement.  The only remedy is for outside intervention to address the systemic, culturally ingrained use of excessive force by Denver law enforcement.

177.    The use of excessive force by the Denver Sheriff's Department (DSD) and Denver Police Department (DPD) is a systemic problem, existing in Denver for decades.  The widespread, accepted use of excessive force by the DSD underscores that the lack of proper training, investigation, discipline and ultimately the lack of effective leadership are deep-seated, ingrained behavior resulting in rampant, continuing constitutional violations that require Federal Court intervention.

178.    The entire system from the Mayor to the Executive Director of Safety to the Sheriff and Police Departments is dismally deficient requiring Court intervention and resulting is systematic widespread abuse and use of excessive force with impunity every day which the City and County of Denver has been unable or unwilling to efficiently address and eradicate.

179.    That if an injunction is not entered irreparable injury will continue to be inflicted upon the citizens and persons with which the DSD and DPD have daily contact and they will suffer severe and substantial injuries similar to the Plaintiff Waller.

# PRAYER FOR RELIEF

Plaintiff prays that this Court enter judgment for the Plaintiff and against each of the

Defendants and grant:

(a)     All appropriate relief at law and equity;

(b)     Economic losses on all claims as allowed by law;

(c)     Compensatory and consequential damages, including damages for personal

injuries including, emotional distress, humiliation, loss of enjoyment of life, and

other pain and suffering on all claims allowed by law in an amount to be

determined at trial;

(d)     Punitive damages on all claims allowed by law and in an amount to be determined

at trial;

(e)     Attorneys' fees and the costs associated with this action, including expert witness

fees, on all claims allowed by law;

(f)     Pre- and post-judgment interest at the appropriate lawful rate; and

(g)     Any further relief that this court deems just and proper, and any other relief as

allowed by law.

(h)     Injunctive relief as follows:

1.     <u>USE OF FORCE</u>

a.     Ban all use of deadly force unless necessary to protect lives of

inmates or staff.  Limit the use of force to maintain order and

discipline to only the minimum level of force necessary to maintain

order and discipline and use of restraints consistent with that level.

b.    The minimum use of force necessary to accomplish these goals.

c.    Cameras be installed in all locations of interaction between deputies and detainees.

d.    Training of all DSD personnel including command staff on appropriate use of force and to require periodic training biannually of personnel.  The first bi-annual training will be completed within three months.

2.    <u>INVESTIGATION</u>

a.    Require the DSD to review all incidents of excessive force in a timely manner.  A review requires all complaints or known incidents of the use of force by a deputy sheriff of the DSD. to be reported immediately and reviewed by a Lieutenant and/or Captain within 48 hours.

b.    Require the DSD to investigate any incident of serious use of excessive force within 30 days.

c.    Require that reports of all investigations to be submitted within 48 hours to the DSD Chief, the Executive Director of the Manager of Safety and the Office of the Independent Monitor (OIM).

3.    <u>DISCIPLINE</u>

a.    That a meaningful accountability system be established including establishing a revised detailed matrix system to determine appropriate discipline for violations including excessive force;

51

failure to report incidents of excessive force; departure from the truth and actions to cover-up use of excessive force for which the presumptive penalty is termination.

4.    LEADERSHIP

    a.    The DSD should be ordered to immediately implement specialized training for all supervisors at all levels of the command structure in regard to use of force, reporting of incidents of use of force and investigation of use of force complaints.

5.    REPORTING REQUIREMENTS

    a.    The DSD establish a liaison position that will assure that all complaints of use of force are documented, that cases of serious use of excessive force are timely investigated and that an explanation be given for any report of use of force that is not investigated.

    b.    Require that the Independent Monitor be given a report of all complaints or known investigations of the use of excessive force and the full investigation of all serious incidents of excessive force.

    c.    The DSD is to submit monthly reports to the Court to verify compliance with this restraining order until further order of the Court.

**PLAINTIFF HEREBY DEMANDS A TRIAL TO
A JURY TO HEAR ALL ISSUES CONTAINED HEREIN**

Respectfully submitted,

PADILLA & PADILLA, PLLC

By:      s/Kenneth A. Padilla
         KENNETH A. PADILLA
         Padilla & Padilla, PLLC
         1753 Lafayette Street
         Denver, CO 80218
         Phone: 303-832-7145
         Fax: 303-832-7147
         E-mail: Padillaesq@aol.com
         Attorneys for Plaintiff